IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JOE J. RUBI,<br><br>       Plaintiff,<br><br>  vs.<br><br>JO ANNE B. BARNHART, Commissioner of Social Security,<br><br>       Defendant. | **MEMORANDUM DECISION and ORDER**<br><br>Case No: 2:02-CV-1383 DN<br><br>Magistrate Judge David Nuffer |

      Claimant Joe J. Rubi appeals the Social Security Appeals Council Order affirming the Commissioner's ruling that Rubi is not entitled to Social Security disability benefits. This case was referred to the Magistrate Judge, with the consent of the parties, to conduct all proceedings pursuant to 28 U.S.C. § 636(c). The Magistrate Judge held oral argument on the review of the administrative decision on December 8, 2005.

      Rubi alleges that the Administrative Law Judge (ALJ) erred because (1) the ALJ's questioning of the Vocational Expert (VE) did not meet the requirements of *Haddock v. Apfel,*[1] and (2) the ALJ did not give proper weight to the opinion of the treating physician. The court does not find any deficiency in the ALJ's questioning of the VE, but finds that this case must be remanded because the ALJ did not receive and consider all the medical evidence to support the opinion of Dr. Petravage, a treating physician identified by Rubi at the hearing.

---

[1] 196 F.3d 1084 (10th Cir. 1999).

1.  Did the ALJ's questioning of the VE meet the requirements of *Haddock*?

In Haddock, the Tenth Circuit considered an ALJ's questioning of a VE where the claimant was found to have an residual functional capacity (RFC) for less than a full range of sedentary work and to have transferable skills from past work.[2] The VE identified four jobs and stated that, in the aggregate, many thousands of them existed in the national economy.[3] However, the VE did not identify the source of his information for this opinion, nor did anyone at the hearing ask him about the source.[4] On appeal, the claimant argued that the VE's testimony was not substantial evidence because three of the jobs named by the VE were not consistent with the exertional requirements described for those jobs by the Dictionary of Occupational Titles (DOT), and that the VE had failed to separately describe the numbers of jobs existing for the one job that was consistent with the DOT description.[5] On review of the record, the Tenth Circuit concluded that the ALJ had not solicited enough evidence for the court to determine whether there was a conflict with the DOT.[6] Because the Commissioner had the burden of production at step five and the agency relied on the DOT as an authoritative source of information,[7] the court held that: "To allow an ALJ to elicit and rely on summary conclusions given by a VE, in the absence of contrary testimony elicited by the claimant through cross-examination, would amount

---

[2]*Id*. at 1087.

[3]*Id*.

[4]*Id*.

[5]*Id*. at 1087-88.

[6]*Id*. at 1089.

[7]*Id*. at 1089-90.

of shifting the burden to produce and develop vocational evidence back to the claimant."[8]  The court made clear that it was not holding that the DOT "trumped" a VE's testimony when there was a conflict about the nature of a job.  Rather, "[w]e hold merely that the ALJ must investigate and elicit a reasonable explanation for any conflict between the DOT and expert testimony before the ALJ may rely on the expert's testimony as substantial evidence to support a determination of nondisability."[9]  Subsequently, the Commissioner adopted the holding in *Haddock* as national policy in SSR 00-4p.

      The facts in this case differ considerably from those considered by the *Haddock* court.  In response to the ALJ's first hypothetical question, the VE cited the DOT numbers for the occupations he believed Rubi could perform with his limitations.[10]  In subsequent hypothetical questions, the VE responded to specific questioning from the ALJ as to whether the numbers of jobs within the occupations named would need further reduction to accommodate Rubi's specific limitations.[11]  Thus, in substance, the ALJ obtained evidence from the VE that showed that Rubi could do jobs contemplated within three or four DOT occupational categories and that there were discrepancies between her testimony and the DOT because of Rubi's limitations, which caused the VE to reduce the numbers of jobs within those occupational categories.[12]  Unlike *Haddock*, the VE in this case clearly based her testimony on the DOT, and the effect of the discrepancies

---

[8]*Id*. at 1090.

[9]*Id*. at 1091.

[10]R. at 78-79.

[11]*Id*. at 79-81.

[12]*See id.*

between an individual who could do a full range of light work and Rubi were delineated by reducing the numbers of jobs described in the DOT.

Consequently, in this case the ALJ did not err because the types and numbers of jobs Rubi could be expected to perform with his limitations were obtained from the VE, and the ALJ's questioning shows that both he and the VE were aware of the discrepancies between the VE's testimony and the DOT. The discrepancies between the VE's testimony and the DOT were acknowledged, and more importantly, the effect of those discrepancies on the number of jobs Rubi could be expected to perform was clearly stated.

2. Did the ALJ give proper weight to the opinion of the treating physician?

When the treating physician provides inadequate information, it is the duty of the ALJ to recontact the physician to determine if the claimant is disabled.[13] In this case, the ALJ gave little weight to the Psychiatric Review Technique (PRT) provided after the hearing by the treating psychiatrist, Dr. Petravage, because the ALJ said there was "no indication in file as to the basis for Dr. Petravage's opinion and no indication as to her relationship to the claimant, that is no treatment or consulting notes."[14]

But during the hearing, Rubi testified that Dr. Petravage was his treating physician and stated how long and how often (monthly) he was seeing her.[15] There are other indications in the

---

[13]*See* 20 C.F.R. § 416.912(e).

[14]R. at 15.

[15]R. at 40-41.

record that Dr. Petravage was a treating physician.[16]  Rubi asked the ALJ to procure the VA medical records because of cost considerations and the ALJ agreed to do so.[17]  Rubi's attorney originally received an estimated bill of $74.20 from Secure Data for "an abstract of entire chart."[18]  The records the ALJ actually received[19] consisted of only twenty-four pages at a cost of $20.00.[20]  The disparity between the cost for requested medical records quoted to him and the sum actually charged to the Social Security Administration (SSA) for the records SSA obtained. strongly suggests that all the medical records were not sent to the ALJ.[21]  Additionally, the package the SSA received included no treatment records from Dr. Petravage, a clear sign that not all records were received.

       The Commissioner argues that the ALJ did not err because it was Rubi's responsibility to provide medical evidence of his alleged disability.[22]  At oral argument, counsel for the Commissioner further argued that the ALJ did what was required under 20 C.F.R. § 416.912(e) to adequately develop the record by leaving the record open and allowing the claimant to submit

---

[16] *See* Medical Record Progress Notes indicating treatment with Dr. Petravage, R. at 199, exhibit 9F at 3; Medical Report from Peter Heinbecker, M.D., stating Rubi "has been treated at the Veterans Hospital here in Salt Lake City by a Dr. Jackie Petrovich [sic]." R. at 203, exhibit 10F at 1; Letter from Veterans Hospital states that any further questions should be directed to Jackie Petravage, M.D., R. at 242, exhibit 15F at 2.

[17] *See* Plaintiff's Reply Brief at 7; SSA letter requesting medical records, dated February 25, 2000, R. at 278, exhibit 16F at 24; Letter from Attorney Borsos to ALJ Henrie, dated February 29, 2000, R. at 241, exhibit 15F at 1.

[18] *See* Plaintiff's Reply Brief at 7.

[19] R. at 255-78, exhibit 16F.

[20] R. at 277, exhibit 16F at 23.

[21] *See* Plaintiff's Reply Brief at 7–9.  Unfortunately, attachments cited in the reply brief at nn. 24-27 were not actually attached to the brief.  Consequently, the court cannot cite to the documents in this order.

[22] Commissioner's Brief at 20.

additional medical evidence to establish disability.[23] The Commissioner also stated that once the requested records came in, the ALJ's obligation to further develop the record ended.[24] This argument was clearly rejected in *White v. Barnhart*,[25] and again, more recently in *Robinson v. Barnhart*.[26] These cases make it abundantly clear that it is the ALJ's duty, not the claimant's, to supplement an inadequate record.[27]

The ALJ's decision simply states that the information he received from Dr. Petravage was inadequate. Rubi, however, testified at the hearing that Dr. Petravage was his treating physician, and supplemented the record with a PRT from her indicating he met a listed impairment. This form is what the ALJ justifiably found inadequate. But precisely because the ALJ received inadequate evidence from the treating physician, the ALJ had the duty to recontact the physician for additional information.[28] The ALJ simply disregarded the treating physician's opinion instead of fulfilling his duty under 20 C.F.R. § 416.912(e) to recontact the treating physician to obtain the necessary information he felt was missing. Accordingly, this case is remanded to the ALJ to

---

[23]Transcript of Hearing on December 8, 2005 at 18.

[24]*Id.*

[25]*White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002) ("If by this accusation the Commissioner suggests that the ALJ's duty to recontact a treating physician is contingent on some further act by the claimant, the Commissioner is wrong.").

[26]*Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004) ("If evidence from the claimant's treating doctor is inadequate to determine if the claimant is disabled, an ALJ is required to recontact a medical source, including a treating physician, to determine if additional needed information is readily available." (Citing 20 C.F.R. §§ 404.1512(e)(1) and 416.912(e)(1))).

[27]*See id.* ("The responsibility to see that this duty is fulfilled belongs entirely to the ALJ; it is not part of the claimant's burden." (Citing *White*, 287 F.3d at 908)).

[28]*See White*, 287 F.3d at 908 ("For it is not the rejection of the treating physician's opinion that triggers the duty to recontact the physician; rather it is the inadequacy of the 'evidence' the ALJ 'receive[s] from [the claimant's] treating physician' that triggers the duty." (Citing 20 C.F.R. § 416.912(e))).

gather all relevant medical information from the treating physician, Dr. Petravage, and reconsider his analysis at step three.[29]

## ORDER

IT IS HEREBY ORDERED that this case is remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

February 21, 2006.

BY THE COURT:


    s/David Nuffer
David Nuffer
U.S. Magistrate Judge

---

[29] *See Williams v. Bowen*, 844 F.2d 748 (10th Cir. 1988) (explaining the five step process); 20 C.F.R. § 416.920(a).